

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-295-CV

IN THE INTEREST OF E.J.C. AND R.A.C.,
THE CHILDREN

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Andrew H. appeals from the trial court's order terminating the parent-child relationship between him and two of his children, Amy and Bobby (both pseudonyms). In twenty-one issues, Andrew challenges the legal and factual sufficiency of the evidence to support termination under family code section 161.001(1)(D), (E), (F), and (N) and the jury's best-interest findings and argues

---

[1] *See* Tex. R. App. P. 47.4.

that delayed service of process deprived him of his right to due process. We affirm.

## Background

Amy and Bobby are the biological children of Andrew H. and Yolanda C. Amy and Bobby were born on January 3, 2001, and June 10, 2003, respectively. At the time of the termination proceedings, Amy was seven and Bobby was five. Although the trial court also terminated Yolanda's parental rights, this appeal concerns only Andrew's relationships with Amy and Bobby.

Andrew testified that Amy and Bobby were born when he and Yolanda lived together. He said that during his relationship with Yolanda, he abused alcohol, which "interfered with everything" and caused him to suffer "blackouts." He testified that he snorted and injected cocaine several times but stopped because he "didn't like it." Andrew admitted that he and Yolanda both used cocaine while caring for Amy. He also said that he occasionally let the children stay with their maternal grandmother, Virginia S., whom he knew to be a cocaine user.

Yolanda testified that while she and Andrew lived together, they both used cocaine "almost every day." Yolanda testified that Andrew used cocaine in Amy's presence, and she recounted an incident when Andrew once left a needle on the bathroom counter when Amy was two years old. She added that

2

Andrew drove under the influence of cocaine with both children in the vehicle. She also stated that Andrew drank alcohol daily throughout the relationship, often to the point of passing out.

Yolanda testified that Andrew physically abused her by punching, slapping, and kicking her "almost every day" in the children's presence. She stated that Andrew hit her multiple times during both pregnancies and once threw a night stand at her while she was pregnant with Bobby. Andrew denied having abused Yolanda, although he admitted that he raised his voice and "probably did" push her.

Yolanda also testified that Andrew was emotionally abusive and told her she "was no good," "was [a] no good mother," and "couldn't make it without him" in front of Amy on several occasions, causing Amy to cry. Yolanda claimed that Andrew often yelled at Amy as well.

Andrew testified that Yolanda moved out in April 2004 and took the children with her. He attributed the breakup to Yolanda's turning twenty-one, at which point she began frequenting clubs and neglecting the children. Yolanda testified that after she moved out, Andrew threatened to kill her and the children; as a result, she obtained a protective order against Andrew, and he pleaded guilty to making a terroristic threat. Andrew said that after Yolanda left, he saw her once in December 2004 but never spoke with her again,

though he said he tried to contact her every three months. He had no contact with the children after Yolanda moved out and said, "I just leave [the] kids with [Yolanda's mother]." Andrew said that Yolanda eventually moved without telling him where she was going, so he lost contact with the children.

In January 2007, the Texas Department of Family and Protective Services ("the Department") removed the children and their younger half-sister, Carrie (a psuedonym), from Yolanda's home in response to an allegation that Yolanda and Carrie's father, Daniel H., were neglecting and abusing the children. The Department instituted termination proceedings in January 2007, seeking to terminate Andrew's, Yolanda's, and Daniel's parental rights. The Department did not serve Andrew with process until December 2007; we will describe the circumstances surrounding the delayed service later in this opinion.

Andrew testified that he first learned when he was served with process that the Department had removed the children and placed them in Virginia's (Yolanda's mother's) home. He said he went to Virginia's house to see the children immediately after being served. The Department later removed the children from Virginia's home, and Andrew said that he saw the children "maybe" five times during the pendency of the suit. Department caseworker Patricia Mosqueda testified that Andrew attended only three of the nine Department-scheduled visitations with his children. Andrew said that he missed

4

scheduled visitations because of his work schedule. He said his inability to see the children made them "sad; they missed me."

Andrew claimed that he now abstains from alcohol, although he wrote on an Internet web page that he is a "social drinker."[2] Andrew sought to have the children placed in the home he shared with his current wife, Sandra, and her two children, but he admitted having told a Department employee that Sandra was unwilling to share in the responsibility of caring or providing for Amy and Bobby. Andrew testified that his marriage to Sandra was solid, but he also admitted that he had posted personal advertisements on several web sites, seeking sexual encounters with other women.[3]

Andrew's adult daughter from a prior marriage, Anna H., testified that Andrew is currently supportive of her son, who calls him "Grandpa." Anna testified that if Andrew's rights were not terminated, she would assist in raising Amy and Bobby. Anna denied ever having seen Andrew hit Yolanda or any other domestic violence. But she said that Andrew probably abused prescription medications before the children were born.

---

[2] The trial court admitted this evidence only for the purposes of impeaching Andrew's testimony regarding his alcohol use.

[3] The trial court admitted this evidence for the limited purpose of impeaching Andrew's testimony regarding his marital relationship.

5

Caseworker Mosqueda testified that the Department provided a service plan with a goal of family reunification—which required a drug and alcohol assessment, counseling, and parenting classes—and arranged visits between Andrew and the children. She stated that Andrew initially refused to submit to drug testing, though later drug tests came back negative. Mosqueda said that the Department planned on Amy and Bobby remaining with their half-sister, Carrie.

Christine Snow, the children's CASA caseworker, testified that during a telephone conversation with Andrew, his speech was noticeably slurred, despite his claiming he was alcohol-free. Snow testified that the children never mentioned their father prior to his visitations, and she advised that terminating Andrew's parental rights would serve the children's best interests.

James Latham, a licensed psychotherapist, testified that he oversaw Andrew's counseling at the Department's request and met with Andrew seven times. Regarding Andrew's Internet sex ads, Latham stated that generally, such postings are often "fantasy"; however, after reading the postings, he responded that they "certainly would raise some concerns" about Andrew's relationship with Sandra.

Latham described Andrew's cocaine and alcohol abuse as "modest" and "under control," respectively, and said that Andrew still "drinks socially."

6

Latham stated that although Andrew gets "a little hot headed at times," he was not abusing his children. But he said that a history of physical abuse "would not surprise [him]" and that he knew Andrew had battered Yolanda in Amy's presence.

Latham stated that, at present, Andrew was "adequately" parenting Sandra's children, who lived with him and Sandra. Latham also said that, as a counselor, he believed Andrew could provide a safe environment and could parent Amy and Bobby without problems.

Beverly Bailey, an employee with the district attorney's office and a licensed professional counselor, testified that although "there are different schools of thought" on the issue, children under the age of three who witness domestic abuse may develop "bonding issues, attachment issues, [and] trust issues." Bailey also testified that a parent's absence "would in fact impact that relationship, because they wouldn't have that closeness" and that "there is a lot that is lost" when a parent is absent. She testified that home instability can create future problems, such as "not eating, not sleeping, crying," and "psychosomatic symptoms" in preschool children.

Andrew's case was tried to a jury in late June 2008.[4] The jury found that Andrew had violated paragraphs (D), (E), (F), and (N) of family code section 161.001(1) and that termination was in Amy's and Bobby's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (F), (N), (2) (Vernon 2008). The trial court terminated Andrew's parental rights and appointed the Department as their permanent managing conservator. Andrew filed this appeal.

**Standard of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination

---

[4] The trial court had previously terminated Yolanda's parental rights in November 2007 and Daniel's parental rights in January 2008.

8

statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

When reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and verdict. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our

10

own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child.  *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

**Discussion**

**1. Grounds for termination**

In his first eight issues, Andrew argues that the evidence is legally and factually insufficient to support the jury's endangering-environment and endangering-conduct findings under sections 161.001(1)(D) and (E).  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

Endangerment means to expose to loss or injury, to jeopardize.  *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), the Department had to prove that

11

Andrew (1) knowingly (2) placed or allowed his children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Andrew's conduct, including acts, omissions, or failures to act. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.T.G.*, 121 S.W.3d at 125. Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A factfinder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17.

In this case, Yolanda testified that Andrew regularly abused her when he lived with her, including hitting her with his closed fist, kicking her, slapping her, and throwing a night stand at her. She said that he abused her when she was pregnant with Bobby and sometimes in Amy's and Bobby's presence. She also said that he verbally abused her in front of the children. When Yolanda left Andrew in 2004, he threatened to kill her and the children; Andrew later pleaded guilty to making a terroristic threat.

Yolanda testified that Andrew drank heavily and daily; Andrew testified that he drank to the point of blacking out. Andrew gave conflicting testimony about when he had last had a drink; at one point, he testified that he had not had a drink in a year and a half and that he did not drink at all anymore, but he also testified that his last drink had been on the previous New Year's Eve, i.e., seven months before trial. His psychotherapist testified that Andrew still drank

13

socially, and evidence admitted for impeachment showed that Andrew had written in Internet chat rooms that he still drank occasionally and socially. A Department caseworker testified that Andrew's speech sounded slurred when she called him two months before trial.

Yolanda also testified that Andrew had snorted cocaine; that after Amy's birth he began to inject cocaine; that he used cocaine when Amy and Bobby were around; and that he left a needle on the bathroom counter when Amy was two years old. Andrew admitted that he had used cocaine after Amy was born, about five years before trial, but he said that he had only used cocaine three or four times and that he did not like it.

The record also shows that Andrew knew the children were in a dangerous environment after Yolanda left him. Andrew told a caseworker that his relationship with Yolanda ended because she was "just crazy" and drank and partied too much, but he made no effort to rescue the children from her care or obtain custody of them after Yolanda left. He also testified that he had left the children in the care of Yolanda's mother despite his concern that she was buying and using cocaine in her home.

Andrew argues that Yolanda's testimony about physical and verbal abuse and drug and alcohol use is not legally or factually sufficient to support the jury's endangerment findings because she was the only witness to so testify.

14

But the trier of fact may believe all, part, or none of the testimony of any witness. *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.). The jury could, and evidently did, believe Yolanda's testimony and resolve the conflicts between her testimony and Andrew's against him. *See id.*; *see also In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder's function "is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony").

Andrew also contends that evidence of events that transpired when he lived with Yolanda is too remote to prove endangerment, citing *Wetzel v. Wetzel*, 715 S.W.2d 387, 390–91 (Tex. App.—Dallas 1986, no pet.). In *Wetzel*, the Dallas court held that evidence showing that a mother had abused her children four years before trial was insufficient to prove endangerment at the time of trial because the record showed that the mother was suffering from mental disorders at the time of the abuse and that her mental disorders had since been cured and there was no evidence that she abused the children at the time of trial or might do so in the future. *Id.* Our case is distinguishable on several grounds. First, there is no evidence that Andrew suffered from a mental condition that caused him to abuse Yolanda and from which he could be cured. There was evidence that Appellant had used drugs in the past and was addicted

15

to alcohol in the past, a condition from which a person can "recover," but there was also evidence that Andrew still drank alcohol, and the jury could have believed that he was not "in recovery." Thus, unlike the mother in *Wetzel*, we cannot say that all of Andrew's problems existed in the remote past. Further, even if the evidence showed that Andrew had recovered from his drug use and alcohol addiction, nothing in the record ties his drug and alcohol use to his physically abusing Yolanda, apart from Andrew's testimony that he was frequently inebriated during his relationship with Yolanda. Second, the fact that Andrew's abusing Yolanda stopped four years before trial is not because he was "cured," like the mother in *Wetzel*, but because Yolanda left him and he no longer had access to her or to the children. Under the circumstances of this case, the jury was free to infer from Andrew's past conduct that similar conduct would recur if the children were returned to him. *See In re D.L.N.*, 958 S.W.2d at 941.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that the jury could reasonably have formed a firm belief or conviction that Andrew placed or knowingly allowed the children to remain in endangering conditions or surroundings and engaged in endangering conduct or knowingly left the children with persons who engaged in endangering conduct. *See* Tex. Fam. Code Ann. §161.001(1)(D), (E). Thus, the evidence was legally sufficient

16

to support the jury's endangering-conditions and endangering-conduct findings. *See In re J.P.B.*, 180 S.W.3d at 573. Viewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Andrew violated paragraphs (D) and (E); thus, the evidence is also factually sufficient. *See In re C.H.*, 89 S.W.3d at 28. We overrule Andrew's first through eighth issues.

Because a finding that a parent violated a single provision of section 161.001(1), when coupled with a finding that termination is in the children's best interest, is sufficient to support termination, we need not consider Andrew's ninth through sixteenth issues, in which he complains that the evidence is insufficient to support the other grounds for termination found by the jury. *See* Tex. R. App. P. 47.1

## 2. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include

17

(1)     the desires of the child;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

18

The children did not testify, and their desires are not otherwise expressed in the record, but Latham testified that the children developed a strong emotional bond with Andrew, even though Andrew said he had seen them just five times during the pendency of the case. Mosqueda testified that they were also bonded to and protective of their half-sibling, Carrie. Andrew testified that he wanted to keep the children in contact with Carrie, but he had no plan for doing so.

Concerning emotional and physical danger to the children now and in the future, Yolanda's testimony that Andrew physically abused her and abused drugs and alcohol in the past was some evidence from which a factfinder could infer that a danger for such abuse existed in the future. Andrew offered no excuse for his behavior when he lived with Yolanda. Bailey testified that introducing the children to an unfamiliar person would have a "high impact" on the children and that an unstable home can create future emotional and behavioral problems.

Regarding Andrew's parenting abilities, his plans for the children, and the stability of his home, Andrew testified about his prior failed marriages and relationships and admitted that he was not very involved in his six children's lives at times. He told the jury about his plans for the children's living arrangements in the home he shared with his current wife, Sandra, and said

19

that Sandra's involvement with the children was an important part of his plan, but he also admitted that he had told a Department employee that Sandra would not share in the responsibility of caring for the children. Further, Sandra did not attend visitations with Andrew, and the Department's home study suggests she was unenthusiastic about having Andrew's children in her home, though Andrew said that she had changed her mind in the five weeks before trial. Andrew's adult daughter, Anna, indicated that his marriage to Sandra was a stable relationship, but the jury also heard testimony about Andrew's trolling the Internet for sex partners, including one online personal ad in which Andrew wrote, "[I] am in a f***** up relationship with a woman who doesn't love me, oh well . . ." on May 26, 2008—about a month before trial.[5] Andrew also admitted that in February 2008, he emailed Mosqueda and told her that he wanted to give up his parental rights and never hear from the Department again; he explained at trial that he was frustrated because Mosqueda was meddling in his life too much. On the other hand, by the time of trial, Andrew had completed a drug and alcohol assessment, a psychological examination,

---

[5] The trial court admitted the personal ad in question, as well as similar ads from other Internet dating sites, for impeachment and instructed the jury that it could consider the ad only if the jury found that the ad did impeach Andrew's testimony regarding his marital relationship.

and a parenting class and had participated in counseling, which tends to show that he was cooperating with the Department and working his service plan.

Mosqueda testified that the Department's plan for the children was adoption and that Amy and Bobby were in an "adoptive placement" foster home with their half-sister, Carrie. The record reflects no other evidence about the Department's plan or the "adoptive placement" foster family with whom the children were living.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that the jury could reasonably form a firm belief or conviction that termination of Andrew's parental rights was in Amy's and Bobby's best interest; thus, the evidence is legally sufficient to support the jury's best-interest finding. *See* Tex. Fam. Code Ann. §161.001(2); *In re J.P.B.*, 180 S.W.3d at 573. Viewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that termination was in the children's best interest; thus, the evidence is also factually sufficient. *See In re C.H.*, 89 S.W.3d at 28. We overrule Andrew's seventeenth through twentieth issues.

3.    **Delayed service of process**

In his twenty-first issue, Andrew argues that the Department's failure to serve him with process until eleven months after the Department filed its

21

termination petition and eight months before trial violated his right to due process.

A parent is entitled to service of citation in a suit affecting the parent-child relationship. Tex. Fam. Code Ann. § 102.009(7) (Vernon 2008). The Department must exercise due diligence to locate a parent:

> (b) If a parent of the child has not been personally served in a suit in which the Department of Family and Protective Services seeks termination, the department must make a diligent effort to locate that parent.
>
> . . . .
>
> (e) The department shall be required to provide evidence to the court to show what actions were taken by the department in making a diligent effort to locate the missing parent and relative of the missing parent.

*Id.* § 161.107 (Vernon 2008). At the initial status hearing, the trial court must make findings as to whether the Department has exercised due diligence to locate all persons entitled to service. *Id.* § 263.202(a)(1) (Vernon 2008). And the Department must describe its efforts to locate and serve parents in a report filed with the trial court before each permanency hearing except the first. *Id.* § 263.303(b)(ii) (Vernon 2008).

The record shows that the Department filed its petition on January 11, 2007, seeking to terminate the parental rights of Andrew, Yolanda, and Daniel. Yolanda testified that when the Department removed the children from her

22

home, she gave the Department investigator Andrew's name, but she did not know where he was living.

In its March 9, 2007 status hearing order, the trial court noted that Andrew had not been served and did not appear. In its June 13, 2007 permanency report, the Department told the trial court that all persons entitled to service had been served. The trial court's June 21 permanency hearing order appears to acknowledge that Andrew had not been served, but it merely states that "[t]he Court has evaluated . . . the department's efforts to obtain the assistance of each parent to provide information necessary to locate an absent parent."

Department liaison officer Albert Hiller testified that when he was preparing for an October 5 permanency hearing, he could not find any evidence that Andrew had been served. Hiller said he found Andrew's address using an Internet search engine. At the October 5 hearing, the trial court found that Andrew had not been served, but it also found that the Department had exercised due diligence in attempting to locate him.

Hiller obtained a civil citation and sent it and the suit papers to the Bexar County sheriff's office. In November 2007, the sheriff's office reported that it had made three unsuccessful attempts to serve Andrew. It eventually served

23

Andrew on December 6, 2007. Among the papers the sheriff served on Andrew was a notice of a January 3, 2008 hearing.

Andrew did not file a formal answer or appear for the January 3 hearing, but he did email the court clerk, and the trial court found that the email was sufficient to be an answer. At the hearing, the trial court terminated the parent-child relationship between Carrie and her father (who was served and did not file an answer), but it deferred Andrew's case and extended the statutory dismissal deadline until July 11, 2008. *See* Tex. Fam. Code Ann. § 263.401(b) (Vernon 2008). The Department set up a service plan for Andrew, and the trial court eventually appointed counsel to represent Andrew. The trial in Andrew's case began on June 30, 2008, about two weeks before the extended dismissal deadline.

Andrew concedes that the family code does not impose a deadline for service of process other than section 263.401's one-year dismissal deadline. *See id*. § 263.401(a). But he argues that the delayed service in this case deprived him of his right to due process under Texas and federal law by denying him a meaningful opportunity and right to reunite with his children. Andrew did not present his due process complaint to the trial court, but he argues that the delayed service rises to the level of public-interest-based fundamental error that he can raise for the first time on appeal.

24

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

But error is not waived if it falls within the narrow category of "fundamental error," which requires no trial court predicate for appellate review. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003), *cert. denied*, 541 U.S. 945 (2004). Fundamental error exists in those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State, or instances in which the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006).

In *In re BLD*, the supreme court refused to extend the fundamental error doctrine to parental-rights termination cases, noting that such cases—unlike juvenile proceedings, to which the fundamental error doctrine does apply—are not quasi-criminal in nature. 113 S.W.3d at 352 (declining to review unassigned jury charge error in termination case as fundamental error). The

25

court further held that an alleged due process violation does not rise to the level of fundamental error in a termination case. *Id.* at 353–54.

The supreme court does, however, recognize fundamental error in the limited situations "in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State." *See Mack Trucks, Inc.*, 206 S.W.3d at 577. But when an alleged error affects the rights of only particular litigants, as in this case, it does not adversely affect the interest of the public generally and does not rise to the level of fundamental error. *See Newman v. King*, 433 S.W.2d 420, 422 (Tex. 1968) (holding that error affecting a child plaintiff's rights affects the rights of only the particular minor and the particular litigants, does not adversely affect the interest of the public generally, and does not constitute fundamental error warranting reversal in the absence of objection); *see also Worden v. Worden*, 148 Tex. 356, 224 S.W.2d 187, 190–91 (1949) (holding no violation of fundamental public policy in a court's judgment of child custody).

We therefore hold that Andrew's delayed-service complaint does not rise to the level of fundamental error. Because he did not raise his complaint in the trial court, he waived it. *See* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712. We overrule Andrew's twenty-first issue.

26

**Conclusion**

Having overruled Andrew's first through eighth and seventeenth through twenty-first issues, and not reaching his ninth through sixteenth issues, we affirm the trial court's termination order.

PER CURIAM

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  April 2, 2009